UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BLAKE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-592 |
| | § | |
| HEWLETT-PACKARD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**OPINION AND ORDER**

Pending before the Court is Plaintiffs' Motion for FLSA Conditional Certification and Notice Under 29 U.S.C. § 216(b) (Doc. 54) filed by named Plaintiff David Blake ("Blake") and opt-in Plaintiff Ezequiel Pitty ("Pitty") (collectively, "Plaintiffs").[1] Blake seeks to conditionally certify a collective action and to issue court-approved notice to a nationwide class of similarly situated individuals. (Doc. 54 at 1-2). Defendant Hewlett-Packard Company ("HP") argues that Blake has failed to identify a coherent class bound by a common factual nexus and, as a result, has failed to establish that he is similarly situated to the putative class members he seeks to represent. (Def.'s Resp. 1-2, Doc. 58).

Having considered the motion and the responses thereto,[2] the record in this case, and the applicable law, the Court concludes that the motion should be denied.

**I.    Background**

This is an action for unpaid overtime compensation under the FLSA,[3] alleging that HP misclassified Blake and similarly situated employees as "exempt" and therefore did not properly

---

[1] One other opt-in plaintiff, Vallery Boyd, filed a notice of consent (Doc. 15) on August 29, 2011, but was dismissed from the action on January 31, 2012. (Order, Jan. 31, 2012, Doc. 52).

[2] Def.'s Resp.; Pls.' Reply (Doc. 61); Def.'s Sur-Reply (Doc. 64); Pls.' Reply to Def.'s Sur-Reply (Doc. 66).

[3] Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219.

compensate them for all hours worked. (Pl.'s First Am. Compl. 1-2, Doc. 5).

      HP is described by both parties as the world's largest information technology company. (Doc. 54 at 2; Doc. 58 at 7). It is divided into various departments, including an Information Technology department ("IT Department") consisting of approximately 4000 employees based in various locations across the United States. (Doc. 54 at 2; Doc. 58 at 5, 7). From March 2008 to February 2011, Blake worked for HP's IT Department under the job title "IT Developer/Engineer," performing all of his duties at the company's Houston, Texas location. (Doc. 54 at 39; Blake Dep. 412:5-7, Dec. 12, 2011, Doc. 54-1; Blake Decl. ¶ 3, Feb. 9, 2012, Doc. 54-6). As an "IT Developer/Engineer," Blake was classified by HP as exempt from the FLSA's overtime provisions, meaning that HP did not have to pay him overtime compensation. (Doc. 54 at 10); *see also* 29 U.S.C. § 213 (stating that § 207 does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity," or to "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker"); 29 C.F.R. § 541.400 ("Computer systems analysts, computer programmers, software engineers or other similarly skilled workers in the computer field are eligible for exemption as professionals under section 13(a)(1) of the Act and under section 13(a)(17) of the Act."). According to Blake, however, his work did not involve developing, engineering, or any other exempt work. (Doc. 54 at 34). Rather, it involved "providing computer support, troubleshooting and resolution of computer technology problems," or "IT support," which Blake argues should not be considered exempt. (Doc. 54 at 34). Moreover, he alleges that his classification as an exempt employee was a deliberate *mis*classification: that HP purposefully gave him a misleading job title in order to justify not paying him overtime compensation. (Doc. 54 at 37).

While the merits of this misclassification claim are not important to the issue of conditional certification, the broader allegations are: Blake alleges that he is but one victim of a nationwide scheme and that this scheme binds the putative class. According to Blake, the genesis of HP's nationwide misclassification policy can be found in a 2006 Department of Labor ("DOL") opinion letter "determin[ing] that the position of an IT support specialist is not exempt and is therefore subject to the overtime provision of the FLSA." (Doc. 54 at 31) (citing Dep't of Labor, Wage & Hr. Adm'r, Op. Ltr. No. FLSA 2006–42, 2006 WL 3406603 (Oct. 26, 2006)). Blake states that until the opinion letter was issued, "HP used the job title 'ITO Support Specialists' (an acronym for IT Operations Support Specialist), and designated the position as exempt"; afterward, "HP virtually (if not completely), eliminated the job title 'ITO Support Specialist' in the United States." (Doc. 54 at 37). Instead of properly classifying these IT Support Specialists as nonexempt and assigning them job titles that accurately described their nonexempt duties, Blake alleges that HP continued to misclassify them as exempt and deliberately assigned them varied job titles that disguised the true nature of their duties. (Doc. 54 at 37). In essence, then, the putative class is composed of IT Support Specialists, as defined by Plaintiffs, who were assigned other titles by HP. Thus, Blake filed this motion to conditionally certify the case as a collective action and to issue court-approved notice to those IT Support Specialists, defined as follows:

> Non-management workers in Hewlett Packard's IT Department [within the United States or its territories], who at anytime from February 17, 2008 to the present were members of a support assignment group who performed the job functions of Incident Analyst and Problem Analyst per the HPSM/HPSC system and were paid a fixed salary, misclassified as exempt, worked more than 40 hours in any given work week and were denied overtime compensation. The putative class specifically excludes all programmers—that is defined as those individuals who developed application software through the writing of code.

(Doc. 54 at 11).

## II.     Legal Standard

Under the FLSA, an employee may pursue an action for unpaid overtime wages on behalf of himself and similarly situated employees who opt into the suit. 29 U.S.C. § 216(b). Whether to certify such a suit as a collective action and facilitate notice to potential plaintiffs lies within the discretion of the district court. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995). Although no particular certification methodology is mandated, one inquiry is common to them all: whether members of the putative class are similarly situated. *See id.* at 1213 (stating that "[t]he center of [the] dispute is what 'similarly situated' means" in the context of collective certification).

## III.    Discussion

This case presents two questions: first, which procedure should be employed in making the certification decision; and second, in applying that procedure, whether there are "some identifiable facts or [a] legal nexus [that] bind[s] the claims so that hearing the cases together promotes judicial efficiency." *McKnight v. D. Hous., Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010) (alteration in original) (quoting *Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003)) (internal quotation marks omitted).

### A.     Certification Procedure

Like most district courts, this Court has generally adopted the two-stage approach articulated in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), consisting of (i) a notice stage, followed by (ii) a decertification stage.[4] *See Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916 n.2 (5th Cir. 2008) (finding that "collective actions typically proceed in two stages"). Under the *Lusardi* approach, in the notice stage, the district court first makes a preliminary

---

[4] A second, less common approach is the "spurious" class action procedure employed in *Shushan v. Univ. of Colo.*, 132 F.R.D. 263 (D. Colo. 1990), which analyzes collective certification according to the Rule 23 class action requirements; i.e., numerosity, commonality, typicality and adequacy of representation.

determination whether potential plaintiffs are similarly situated to the named plaintiff. *Mooney*, 54 F.3d at 1213-14. If they are, then the court conditionally certifies the action and authorizes notice to potential plaintiffs to opt in, and the suit "proceeds as a representative action throughout discovery." *Id.* at 1214. The second stage comes after discovery is largely complete and the defendant files a motion for decertification. *Id.* If the court determines from discovery evidence that the plaintiffs are in fact similarly situated, then the case proceeds as a representative action. *Id.* But if the court finds that the plaintiffs are not similarly situated, then the class is decertified, the opt-in plaintiffs are dismissed without prejudice, and the original plaintiff proceeds to trial on his individual claims. *Id.* at 1213-14.

Though this is the typical approach, it is not the only available option. *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 n.1 (5th Cir. 2010) ("[W]e have not adopted any of the varying approaches for determining whether employees' claims are sufficiently similar to support maintenance of a representative action."); *Mooney*, 54 F.3d at 1216 ("[W]e specifically *do not* endorse the methodology employed by the district court, and *do not* sanction any particular methodology. We simply need not decide the appropriate methodology under these facts, and therefore leave that inquiry for another day."). On the contrary, by its very nature, the issue of collective certification lends itself "to *ad hoc* analysis on a case-by-case basis." *Mooney*, 54 F.3d at 1213 (noting that "*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the 'similarly situated' analysis"). Thus, it is necessary to first understand the rationale behind the *Lusardi* two-stage process before deciding if that approach, "the *Shushan* approach, or some third approach should be used in determining whether employees' claims are sufficiently similar to support the maintenance of a

representative action." *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 293 (S.D. Tex. 2012) (citing *Acevedo*, 600 F.3d at 518-19).[5]

Division of the process into two stages is based on temporal and evidentiary distinctions, with the former justifying the latter. The importance of the temporal aspect is that the statute of limitations is not tolled for the putative class as a whole when the complaint is filed, but instead continues to run for each individual employee until he or she consents to become a party plaintiff. 29 U.S.C. § 256 ("[A]n action is commenced … in the case of any individual claimant … [when] written consent is filed in the court in which the action was commenced."). Consequently, conditional certification and notice early in the litigation allows potential plaintiffs the opportunity to toll the limitations period as to their individual claims by making them aware of the pendency of the action and their right to opt in. On the other hand, it does not allow for extensive discovery, thereby justifying lower evidentiary requirements. The result is that at the notice stage, the district court usually makes a conditional certification decision "based only on the pleadings and any affidavits which have been submitted," and "[b]ecause the court has minimal evidence, this determination is made using a fairly lenient standard." *Mooney*, 54 F.3d at 1214. The decertification stage occurs later, "after discovery is largely complete and the matter is ready for trial," when "the court has much more information on which to base its decision[ ] and makes a factual determination on the similarly situated question" using a more stringent evidentiary standard. *Id.* Additionally, because of these distinctions, courts traditionally rely on different factors at the two stages. At the notice stage, courts "have considered factors

---

[5] HP urges adoption of the legal standard applied in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), but that case dealt explicitly with certification of class actions under Rule 23. Because "[t]here is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 216(b)," *Sandoz*, 553 F.3d at 916 (quoting *LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 287 (5th Cir. 1975) (per curiam)) (alteration omitted), the Court concludes that the *Dukes* holding is inapplicable to conditional certification of FLSA collective actions.

such as whether potential plaintiffs were identified, whether affidavits of potential plaintiffs were submitted, and whether evidence of a widespread … plan was submitted." *H & R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (citations omitted). During the decertification stage, courts have considered "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008) (collecting cases).

Of course, the ultimate purpose of the similarly situated inquiry is to determine whether "hearing the cases together promotes judicial efficiency," *McKnight*, 756 F. Supp. 2d at 801 (citation and internal quotation marks omitted), and the advantage of allowing limited certification discovery is that it leads to a more accurate determination at the notice stage, thereby making the ensuing merits discovery more focused, relevant, and efficient, *see Sedtal v. Genuine Parts Co.*, No. 1:08-CV-413-T, 2009 WL 2216593, at *7 (E.D. Tex. July 23, 2009) ("Allowing Plaintiffs [discovery on the issue of conditional certification] may help them demonstrate that a sufficient number of similarly situated plaintiffs exist to conditionally certify the action. Conversely, it may underscore inadequacies in the group of potential plaintiffs." (citation omitted)). As the parties conduct more discovery, the importance of the evidentiary distinctions begins to fade, and the rationale for applying a limited, lenient inquiry at the notice stage loses its force. *See Valcho v. Dall. Cnty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008) (finding "less cause for leniency during the 'notice' phase of the analysis where a plaintiff has already conducted discovery on the certification issue" and "hesitat[ing] to facilitate notice where a plaintiff … still cannot support her claim with evidence"); *Harris v. Fee Transp. Servs., Inc.*, No. 3:05-CV-0077-P, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006) ("[W]here the

parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent."); *Basco v. Wal-Mart Stores, Inc.*, No. Civ.A. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004) ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should certify this matter."); *Pfohl v. Farmers Ins. Grp.*, No. CV03-3080 DT (RCx), 2004 WL 554834, at *3 (C.D. Cal. Mar. 1, 2004) (proceeding to the second-stage analysis and weighing all "relevant factors to determine whether the plaintiffs are similarly situated" because discovery had been undertaken on the issue of certification); *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004) ("find[ing] it appropriate to apply a more rigorous standard" when the plaintiffs conducted discovery and filed supplemental evidence in support of their motion); *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1081 (D. Kan. 1998) ("adopt[ing] an 'intermediate' approach in analyzing the 'similarly situated' issue" upon completion of some discovery). In such a situation, it is proper to consider all evidence in the record, *Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 WL 772756, at *9 (S.D. Tex. Mar. 12, 2007), and from this evidence, to require more than the "substantial allegations" that are normally sufficient at the notice stage, *see Mooney*, 54 F.3d at 1214 & n.8 (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part and appeal dismissed in part*, 862 F.2d 439 (3d Cir. 1988), *aff'd and remanded sub nom. Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989)). Instead, there must be actual evidence showing "that the putative class members were together the victims of a single decision, policy, or plan," *id.* at 1214 n.8 (quoting *Sperling*, 118 F.R.D. at 407) (internal quotation marks omitted), and that a "legal nexus [binds] the claims so that hearing the cases together promotes judicial efficiency," *McKnight*, 756 F. Supp. 2d at 801 (quoting *Barron*, 242

F. Supp. 2d at 1103) (internal quotation marks omitted). In the end, "a district court 'should satisfy itself that there are other employees of the department-employer who desire to "opt-in" and who are "similarly situated" with respect to their job requirements and with regard to their pay provisions.' " *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *9 (S.D. Tex. Jan. 24, 2007) (quoting *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)).

In this case, the parties had at least five months of discovery before Plaintiffs' filing of their motion for conditional certification and notice. (*See* Joint Disc./Case Management Plan, Doc. 14). In that time, HP had the opportunity to depose Blake, and Plaintiffs had the opportunity to depose former HP Chief Information Officer (CIO) Randy Mott (Doc. 54-5) and senior-level HP employees David Quelly (Doc. 54-3) and Thomas Tripp (Doc. 54-4). Additionally, Plaintiffs reviewed thousands of pages of documents, (Doc. 61 at 8), and attached portions of this accumulated discovery evidence to their motion, constituting hundreds of pages of exhibits, (*see* Doc. 54 Exs. 1-50).

Given the extent of the inquiry into the issue of collective certification already conducted, the Court considers it appropriate to use an intermediate approach: following the two-step process and imposing a heightened evidentiary standard commensurate with the opportunity to conduct discovery. In other words, because Plaintiffs have been allowed the opportunity to gather more than just "minimal evidence," they are required to support their motion with more than minimal evidence. Moreover, that evidence must address each of the factors that is material to the issue of collective certification. As the certification analysis is ad hoc by nature, those factors are determined according to the specific claims and defenses asserted. *Mooney*, 54 F.3d at 1213; *McKnight*, 756 F. Supp. 2d at 801. As explained below, because this is a nationwide

misclassification case, the two material factors are the company's implementation of a common corporate policy and the employees' performance of similar job duties. Each of these elements is necessary to establish that a common analysis based on representative proof can be applied to all members of the putative class at the merits stage; absent such a showing, there would be no efficiency in—and, therefore, no justification for—collective adjudication. *See Hoffmann-La Roche*, 493 U.S. at 170 (1989) (explaining the benefit "of efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity").

### B.   Certification Analysis

Where some discovery has been conducted, the putative class members must make a factual showing that "they were affected by a common policy, plan, pattern or practice in order to proceed collectively under Section 216(b) of the FLSA." *Falcon*, 580 F. Supp. 2d at 535 (collecting cases); *cf. Mooney*, 54 F.3d at 1214 & n.8 (explaining that a lenient standard employed at the notice stage "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan" (quoting *Sperling*, 118 F.R.D. at 407 (collecting cases)) (internal quotation marks omitted)). Where a nationwide policy is alleged, this factual showing consists of two elements: (i) "that the same policy applies to multiple locations," *Rueda v. Tecon Servs., Inc.*, No. H-10-4937, 2011 WL 2566072, at *4 (S.D. Tex. June 28, 2011) (collecting cases), and (ii) that the putative class members all performed similar job duties, *see Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 810 (S.D. Tex. 2003) (requiring similarity of job requirements and pay provisions) (quoting *Dybach*, 942 F.2d at 1567-68); *see also Tice v. AOC Senior Home Health Corp.*, 826 F. Supp. 2d 990, 996 (E.D. Tex. 2011) (requiring that "potential class members performed the same basic tasks and were subject to the same pay practices"). Both elements are necessary to establish that

representative proof can be used at the merits stage, thereby justifying collective adjudication of multiple claims. Here, Plaintiffs claim that the putative class members all worked as "IT Support Specialists" and that HP's policy was to purposely give them inaccurate job titles and misclassify them as exempt. (Doc. 61 at 24) (alleging that instead of "reclassify[ing] its IT Support Specialists as non-exempt workers and pay[ing] them overtime compensation in 2006, HP … gave Plaintiffs and the putative class members job titles that were not only varied, but also did not properly describe their job functions").

    *1.*    *Common Policy*

In cases involving geographically diverse locations, certification is proper only if the same corporate policy applies to all such locations. *Heeg v. Adams Harris, Inc.*, No. H-12-684, 2012 WL 5381767, at *5 (S.D. Tex. Oct. 31, 2012). As there is an absence of direct evidence of such a policy, Plaintiffs instead rely on circumstantial evidence to show the geographic scope of this alleged misclassification scheme: (a) the existence of a "single HR lead administrator," as proof of a central policymaker, and (b) employee records, as proof of the policy's nationwide implementation. As explained below, this evidence is not persuasive.

    *(a) Single HR Lead Administrator*

Plaintiffs summarize their first argument as follows:

> Almost all of the employees in the HP IT Department were classified as "exempt" under the FLSA in accordance with the determination of the HP Human Resources lead administrator for IT. Accordingly, the decision to misclassify IT Support Specialists was made by the HR lead administrator, who was charged with classifying IT Department employees under the FLSA, establishing their job titles and establishing their pay provisions.

(Doc. 54 at 31) (footnotes omitted) (citing Mott Dep. 131, 180, Feb. 1, 2012, Doc. 54-5). Therefore, the focus of this inquiry is evaluating the evidence that exists to support this claim. That evidence—the sole evidence cited by Plaintiffs—is the deposition testimony of Randy

Mott, who served as Chief Information Officer ("CIO") and managed the HP IT Department during the period relevant to this suit, (Doc. 54 at 3), but was laid off by HP in 2011 when the company's reorganization made his position redundant, (Doc. 54-5 at 39:22-40:15).

Upon review, Mott's testimony simply does not support the argument for which it is cited. Mott repeatedly states that he does not know the specific provisions of the FLSA, does not know the precise distinction between exempt and nonexempt employees, and is "not in a position to be defining" employee status. (Doc. 54-5 at 174:15-175:3). He further testifies that, while working at HP, he was neither familiar with the classification process nor aware of its results. When asked "[w]ho was responsible for determining within Global IT whether workers were deemed to be exempt or nonexempt," he answered, "I don't know"; when asked "who would [he] contact if [he] wanted to get information on how a worker was classified," he explained, "I didn't." (Doc. 54-5 at 9:9-25). And when pressed for an opinion, Mott states he "believe[s] that there were a lot of exempt employees in the IT organization," explaining:

> I think that they are professional, that they're creating, that they're not being managed to a task, that they have a lot of judgment, they have a lot of independent choice, and that they have a lot of creative and development and innovation capability as a part of their job content. That was also very important in terms of having motivated and satisfied employees is that they had a sense of accomplishment by having that kind of work.

(Doc. 54-5 at 178:15-23). Mott's deposition testimony also includes the following exchanges, which Plaintiffs cite specifically in support of their argument above regarding the existence of a single HR lead administrator:

> **Q: And when you were CIO, were you aware that the majority of the workers in your department were classified as exempt from overtime?**
> A: I—was I aware? Did I get a report showing how many were or weren't? No. Did I expect that from what—what I knew the job responsibilities of most of the workers being, which is what I just described? Yes, I expected that. Did I expect it to be constantly growing as a percentage based on the overall high level objectives? Absolutely.

(Doc. 54-5 at 180:15-24).

> **Q: Who determines what job title is going to be given to that worker?**
> A: Well, I think you've got two questions there. One is, job titles are typically managed in the HR organization, and then it's in conjunction with HR in the hiring process in terms of what level or what job title they would be assigned to.
> **Q: So HR works in conjunction with whom in order to determine the job title?**
> A: It would be—more than likely, it'd be the first-line manager, but it depends on if you were hiring a first-line manager, in which case it would be the second-line manager, unless they were hiring the second-line manager, so it would be the hiring manager.

(Doc. 54-5 at 131:11-24).

Nowhere in this testimony is there support for Plaintiffs' claim that a single HR lead administrator implemented a plan to misclassify and misname all personnel who otherwise would be titled as IT Support Specialists. Instead, Mott's testimony can be summarized as follows: he is unfamiliar with the specifics of the FLSA; he does not know who or how many of the employees in the HP IT Department were classified as exempt or nonexempt; he does not know who specifically classified employees as exempt or nonexempt; in hindsight and based on his current understanding of the FLSA, he believes that the majority of the IT employees were doing the type of creative, innovative, and complex work that would classify them as nonexempt; and the assignment of those employees' job titles was made in conjunction with local supervisors. In short, the testimony does not support the conclusion for which it is cited, and without such support, Plaintiffs' allegations constitute mere speculation.[6]

> *(b) Employee Records*

---

[6] Plaintiffs make additional allegations that are not supported by the cited evidence. For example, Plaintiffs claim that "[t]he HR lead administrator makes an *ad hoc* decision regarding the job title to be given to any worker within the IT Department and also may change the job title of the worker without changing the worker's job duties and responsibilities," citing pages 133 and 134 of Mott's deposition testimony. A review of that testimony, however, reveals nothing that justifies this claim.

Nevertheless, Plaintiffs point to the effects of HP's alleged scheme as evidence of its centralized creation and nationwide enforcement. This evidence consists of the changing job titles given to Vallery Boyd and the online profile of a Hewlett Packard Asia Pacific employee.

First, Plaintiffs claim that the records of one HP employee, former opt-in Plaintiff Vallery Boyd, are proof of HP's plan to obfuscate the truth: giving her misleading job titles and misclassifying her as exempt while she performed nonexempt work. (Doc. 54 at 38). According to Plaintiffs, from 2005 to 2006, Boyd was assigned the job code "ITO Support Specialist V"; in November 2006, she was changed to job code "Technical Analyst IV"; and in November 2007, changed again to job code "IT Developer/Engineer III"—all while "her responsibilities [and exempt status] remained the same." (Doc. 54 at 37-38). But Boyd's performance plans (Doc. 54 Exs. 30-32) do not quite back up that claim. While her primary duties as an ITO Support Specialist V were "to provide deep support, consult, deploy, implement, and maintain the device managed services or core infrastructure environment," (Doc. 54 Ex. 30), when her title changed to Technical Analyst IV, her primary duties also changed "to be the service engineering lead for HPIT End User specific technologies, programs, and projects … [and to] work[ ] as a member of an engineering team developing, designing, and maintaining one or more of products or technologies," (Doc. 54 Ex. 31). Moreover, Mott testifies that from 2005 to 2008, "hundreds" of IT job titles were eliminated, thereby changing the titles of at least hundreds of employees. (Doc. 54-5 at 131:25-133:15) (stating that "[t]here was an effort in the whole company, including Global IT, to come up with more … consistent job titles, and that got [from hundreds] to the 70 to 80 across all of IT"). Given this context, Boyd's situation does not seem out of the ordinary, let alone proof of a larger plan.

More importantly, the record shows that Plaintiffs had the opportunity to gather

additional evidence from Boyd to clarify her situation and support their conclusion, yet failed to take advantage of that opportunity. After filing a notice of consent to join the collective action, Boyd later withdrew her consent, (Notice of Withdrawal, Doc. 50), and was dismissed from the action with prejudice, (Doc. 51). At no time prior to her withdrawal (or after) did she submit an affidavit or respond to HP's discovery requests, including requests to schedule a deposition. (Def.'s Unopposed Mot. to Dismiss Opt-in Pl. Vallery Boyd with Prejudice 1, Doc. 51). As Boyd's records are subject to multiple interpretations, most of which are innocuous, it is incumbent upon Plaintiffs to provide a reasonable basis for crediting their claim that those records imply the existence of a nationwide misclassification scheme. In this instance, they have failed to meet that burden.[7]

Next, Plaintiffs cite the personal "LinkedIn.com" profile of one Hewlett Packard Asia Pacific employee, where the employee describes his position as "ITO Support Specialist." (Doc. 54 Ex. 47). Plaintiffs argue that "it appears that HP may still be using the 'ITO Support Specialist' job title in Asia, because it is outside the jurisdiction of the DOL and the FLSA does not apply in Asia," contrasting this with HP's elimination of the job title in the United States and concluding that HP's actions in the U.S. must have been taken to circumvent the FLSA. (Doc. 54 at 37) (footnote omitted) (reasoning that "HP would have no motivation to change titles to avoid compliance in Asia as it did in the United States"). There are several significant problems with this evidence. For example, one problem is that it is based on an informal internet posting of a lone employee, which is a weak sample from which to extrapolate the official policies of an entire corporate entity. Second, that corporation is not Defendant—it is HP Asia Pacific. In other words, this evidence suffers from irrelevance: there is no reason to infer the motives of

---

[7] Plaintiffs claim that the records of two other employees also support their allegations. (Doc. 54 at 38). Neither record, however, consists of more than one performance plan, and without such files for comparison, it is impossible to find support for Plaintiffs' allegations that HP instituted any changes.

Defendant from the action or inaction of a separate, independent corporate entity in Asia. The logical leap from this single, unofficial internet posting to Plaintiffs' conclusion is simply too far to be supported.

2.    *Common Job Requirements*

Because "[t]he determination of whether an exemption applies to a given individual … is a very fact-specific exercise," *Tumminello v. United States*, 14 Cl. Ct. 693, 697 (1988) (collecting cases), a common exemption analysis can be applied to a group of individuals only if evidence of the dispositive facts can be applied to all such individuals. In misclassification cases, the dispositive facts are those that define an employee's primary duties. *See* 29 C.F.R. § 541.700 ("To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work."). Therefore, for the purpose of certifying a collective action, a critical question is whether there is sufficient similarity of job duties to allow collective determination of exemption status. *See, e.g.*, *Aguirre*, 2007 WL 772756, at *12 (asking "whether each individual's job duties must be scrutinized; and … the degree to which evidence regarding the named plaintiffs' job duties can be applied to other employees"). For example, where the employees' duties are defined according to their job titles, commonality of such titles is sufficient because one employee's duties will be the same as the others'. *See, e.g.*, *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 617, 620 (D. Conn. 2007) (granting conditional certification of a class of all employees who worked as an "appraiser for damaged automobiles," identified by the positions "Associate Appraiser-Auto, Appraiser-Auto, and Senior Appraiser-Auto"). On the other hand, where duties do not correlate with titles, there must be some other means of identifying and binding the employees; otherwise, each claimant would require an individualized inquiry. *See Aguirre*, 2007 WL 772756, at *14 ("In cases with …

variability among the members of the putative class of allegedly misclassified employees, courts have refused to certify the case for collective treatment because an individual inquiry into each plaintiff's job duties is required." (collecting cases)).

In this case, Plaintiffs define the putative class members as "IT Support Specialists." (Doc. 54 at 3) ("This lawsuit has been brought by Mr. Blake and those similarly situated IT support personnel within the HP IT Department that provide support services and will be referred to as 'IT Support Specialists.'"); (Doc. 61 at 1) (referencing "the Department of Labor's … opinion letter concluding that IT Support Specialists who are responsible for the diagnosis of computer-related problems, conduct problem analysis and research, troubleshoot, resolve complex problems, and ensure the timely closeout of trouble tickets, are not exempt from FLSA's overtime coverage under either the 'administrative' … or the 'computer' employee exemption"). This, however, is not their actual job title; in fact, it is not a job title at HP at all. (Doc. 54 at 37). Instead, Plaintiffs use this description to include "individuals <u>regardless of job title</u>: Non-management workers in Hewlett Packard's IT Department, who … were members of a support assignment group who performed the job functions of Incident Analyst and Problem Analyst per the HPSM/HPSC system." (Doc. 54 at 11) (emphasis in original) (footnote omitted). Because Plaintiffs disavow the designations assigned to them by HP, they cannot rely on the similarity of such labels to establish similarity of job requirements and must articulate some alternative means of doing so. Plaintiffs attempt this by defining their common duties as "the job functions of Incident Analyst and Problem Analyst per the HPSM/HPSC system," (Doc. 54 at 11), or "resolving tickets, so called 'incident management,' 'problem management,' 'escalation management' and 'change management,'" (Doc. 54 at 8). Thus, the result of the "job requirements" analysis hinges on whether these duties and the evidence of their performance

bind the putative class members in a manner that allows collective adjudication of their exemption status.

     *a.*     *Primary Duty*

An employee's primary duty is defined as "the principal, main, major or most important duty that the employee performs":

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). Importantly, although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," it is not the sole or determinative factor; therefore, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b). Finally, which work is considered exempt under this test depends on the specific sections defining the relevant exemptions; in this case, the administrative and computer employee exemptions.

Administrative employees are those "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Computer employees are those whose primary duty consists of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;

(2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400(b). Accordingly, whether Plaintiffs' proposed class definition enables collective adjudication depends on whether that definition and the evidence supporting it can be used to reach a common conclusion under the tests above.

      *b.  Evidence*

The primary evidence offered by Plaintiffs is the HP IT employee performance plans, from which Plaintiffs draw a list of "similarly situated" employees from across the country, along with the "similar" infrastructure/software support services they perform. Relying on this list, Plaintiffs argue that:

> HP has admitted that individuals with David Blake's position in Texas, Georgia, Oregon, California, Colorado, Idaho, Nevada, Washington, New Hampshire, Massachusetts, Puerto Rico, Maryland, Florida, New Jersey, Nebraska and Ohio (1) provided infrastructure/software support services supporting HP Internal end users of computer network, computer software and computing infrastructure business tools for internal HP business use within the United States from February 17, 2008 to the present and (2) were given the FLSA status of "exempt" by HP.

(Doc. 54 at 30). The purpose of presenting this list of employees is to show, on a nationwide scale, "that HP was not paying similarly situated support personnel overtime." (Doc. 54 at 31). This alleged commonality is based on descriptions of job functions such as, in describing employee #21595844, that he "[a]lways kept track of his open incidents, Problem Tickets and ensured these tickets are followed/closed"; for employee #00473209, that he "[c]ontinued control of incidents, change, service, and related Tickets for [his] area of responsibility … in support of application teams"; and for employee #00593057, that he "[r]esolve[d] network incidents," that

"[c]hange management process [was] followed for most changes," and that "[a]ll incident management process commitments were met." (Doc. 54 Ex. 8). At the same time, the list omits elements of the employees' job requirements that show dissimilarities impacting the exemption analysis: for example, for employee #00337057, "hav[ing] ongoing project management responsibility with cross-functional or cross-organizational influence"; and for employee #00349299, "[o]versee[ing] the planning, coordination and support of complex or critical business processes, systems or user/customer requirements at highest levels" and "hav[ing] ongoing project management responsibility." (Doc. 54 Ex. 8).

The result is that this list and the job duties on which it relies do as much to highlight the dissimilarities between the proposed class members as the similarities. Furthermore, the similarities that are identified suffer from vagueness, as the work of "resolving tickets" is simply too general to bind the class; in other words, because such identification alone is not determinative of exemption status, it cannot be used to establish similarity of situation. For example, Blake already acknowledges a factual dispute over his status based on circumstances that apply only to him, (Doc. 61 at 23-24), and resolving such disputes for individual plaintiffs defeats the purpose of collective certification. *See Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1057 (D. Minn. 2011) (finding that job descriptions that are vague or do not fully capture the scope of duties performed do not eliminate the need to conduct a detailed analysis of each employee's actual job duties and, therefore, do not weigh in favor of collective treatment); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 578-79 (E.D. La. 2008) (explaining that similarity of job duties "[a]t a high level of generality" is insufficient where certain differences would preclude adjudication on the merits "on the basis of representative proof"); *Aguirre*, 2007 WL 772756, at *15 (finding that differences in the amount of time spent on tasks and the level of

discretion exercised in completing those tasks requires a fact-intensive analysis that makes collective treatment of employees' claims improper).

Additionally, HP offers declarations of employees who fit Plaintiffs' class definition by resolving tickets, but who, when examined more carefully, appear not to be similarly situated; e.g., Kuo Lin, who works on tickets via the HPSM system but "almost always" writes code to resolve those tickets, (Doc. 58 Ex. J. ¶ 11); Jim Papanastasiou, who resolves issues through the HPSM system that "often involve[] modifying or rewriting code," (Doc. 58 Ex. H. ¶ 11); Anh Nguyen, who spends most of her time working on HPSM tickets that "often … involve modifying code," (Doc. 58 Ex. D ¶¶ 7-8); Ronald Tumewu, who spends most of his time "on the analysis, design, development and testing components of a project" and the rest of his time resolving incident tickets, (Doc. 58 Ex. I ¶¶ 8-9); Aradhya Channabasava, who spends only five to ten percent of her time resolving incident management tickets, approximately ten to fifteen percent of her time troubleshooting and fixing issues, and the majority of her time on the "analysis, design, coding, [and] modification" of computer systems, (Doc. 58 Ex. E ¶¶ 8-9). Plaintiffs counter that these "happy camper" declarations are of no value because they go to the merits of the case rather than to the issue of conditional certification. (Doc. 61 at 19). Indeed, this is not the appropriate time to weigh the merits of the case. *See Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 840 (N.D. Ohio 2011) (disregarding affidavits stating that employees "never had an issue with" their employer); *West v. Lowes Home Ctrs., Inc.*, No. Civ. 6:09-1310, 2010 WL 5582941, at *8 (W.D. La. Dec. 16, 2010) ("happy camper" declarations that contradicted plaintiffs' declarations), *report and recommendation adopted*, 2011 WL 126908 (W.D. La. Jan. 14, 2011); *Madden v. Corinthian Colls., Inc.*, No. 08-C-6623, 2009 WL 4757269, at *3 (N.D. Ill. Dec. 8, 2009) (affidavits that went to the merits of the case or the amount of

potential damages, not the existence of a similar plan or policy). The importance of the HP employees' affidavits, however, is not that they impact the merits of Blake's claim, but that they undermine the usefulness of his class definition; for if that definition includes both exempt and nonexempt employees, then the members of the putative class cannot be similarly situated.[8]

Finally, Plaintiffs rely on their own declarations to show the existence of similarly situated victims of a common plan. At the notice stage, courts "have considered factors such as whether potential plaintiffs were identified, [and] whether affidavits of potential plaintiffs were submitted." *H & R Block*, 186 F.R.D. at 400 (citations omitted). Here, Plaintiffs have submitted only two declarations, both from a single location (HP's Houston office) and from only one opt-in plaintiff (Ezequiel Pitty). In fact, Pitty is the only opt-in plaintiff who has consented to participate in the suit, despite Blake's repeated claims that he knows of and is familiar with other similarly situated employees, both in Houston and at other locations. (*See* Doc. 54 at 6, 7, 9, 10, 30). These two declarations—from a single office and including a single opt-in plaintiff—are simply too meager to support conditional certification on a nationwide scale. Even under the most lenient standard, where different locations are implicated, a plaintiff must "submit affidavits from other employees alleging that they worked at different locations and were subject to a similar overtime policy." *Ali v. Sugarland Petroleum*, No. H-09-0170, 2009 WL 5173508, at *5 n.4 (S.D. Tex. Dec. 22, 2009). In this case, Plaintiffs have failed to do even that.

Ultimately, the question that must be answered is whether "there are other employees … who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Simmons*, 2007 WL 210008, at *9 (quoting *Dybach*, 942

---

[8] Plaintiffs argue that they specifically "define their class to exclude managers and programmers," (Doc. 61 at 2), but this merely begs the question at the heart of the certification inquiry: whether Plaintiffs' definition captures, along with allegedly exempt employees, those who are nonexempt under the rules for administrative and computer employees. Arguing that it does not include them because it excludes them is unhelpful circular reasoning.

F.2d at 1567-68) (internal quotation marks omitted). After more than five months of discovery, there is still insufficient evidence to answer in the affirmative. Blake has not adduced evidence of a nationwide plan, nor has he made a factual showing that the putative class members performed duties sufficiently similar to allow a common exemption analysis. In short, he has failed to satisfy either of the two elements necessary for conditional certification in a nationwide misclassification case.

## IV.    Conclusion

"[T]he power to authorize notice must be exercised with discretion and only in appropriate cases." *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 886 (11th Cir. 1983). "Thus because the court does not intend that its powers be used for a 'frivolous fishing expedition,' it will hesitate to facilitate notice where a plaintiff, having already conducted discovery, still cannot support her claim with evidence." *Valcho*, 574 F. Supp. 2d at 622 (quoting *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995)) (citation omitted). Otherwise, the result is too likely to be the conditional certification of a large nationwide class, followed by extensive discovery and, after an inefficient expenditure of resources, decertification. *See Johnson*, 561 F. Supp. 2d at 568 (decertifying a nationwide class of 936 plaintiffs after conducting eight-day bench trial and considering thirty-three additional depositions); *Badgett v. Tex. Taco Cabana, L.P.*, No. H-05-3624, 2006 WL 2934265, at *2 n.6 (S.D. Tex. Oct. 12, 2006) (noting that of the 115 putative collective actions filed in the Southern District of Texas in 2005, only 17 were ultimately certified). The bottom line is that "the court must be satisfied that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits ...." *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003). In this case, there is no such satisfaction. This Court cannot allow a plaintiff, after

granting him more than five months of discovery on the issue of certification, to proceed with a collective action on the basis of such scant evidence.

Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion (Doc. 54) is **DENIED**; it is further

**ORDERED** that opt-in Plaintiff Ezequiel Pitty is **DISMISSED** without prejudice.

SIGNED at Houston, Texas, this 11th day of July, 2013.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE